IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SHAWN CURTIS DONGES,

      Plaintiff,                      No. CIV S-09-0360 DAD P

    vs.

DON DURETT, et al.,             <u>ORDER AND</u>

      Defendants.             <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

        Plaintiff is a state prisoner proceeding pro se and in forma pauperis with an action filed pursuant to 42 U.S.C. § 1983. On January 31, 2011, defendants Baker and Durett filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff has filed an opposition to the motion, and defendants have filed a reply.

**BACKGROUND**

        Plaintiff is proceeding on a second amended complaint against defendants Durett, Flicker, and Baker.[1] Therein, he complains about the following conditions of confinement at the Butte County Jail ("BCJ") that he allegedly experienced while incarcerated there as a pretrial

---

[1] Defendants Baker and Durett are represented by attorneys with the law firm Trimble, Sherinian & Varanini. Defendant Flicker is represented by attorneys with the Law Offices of Deems & Keller, LLP and has also filed a motion for summary judgment which the court will address in separate findings and recommendations.

1

detainee. Plaintiff alleges that defendant Durett was aware that plaintiff had chronic pain, but from December 3, 2008, to May 14, 2009, defendant Durett failed to provide plaintiff with adequate pain management or help him through his withdrawal from Methadone and Oxycodone.[2] According to the complaint, for two to three weeks plaintiff experienced extreme pain, vomiting, stomach ulcers, insomnia, and muscle cramps. Plaintiff also alleges that defendant Durett was aware that plaintiff suffered from AIDS. Plaintiff alleges that he was nonetheless denied his AIDS medication thereby shortening his life span and making him more susceptible to illness and infection. (Sec. Am. Compl. at 3.)

Plaintiff alleges that defendant Flicker knew there was a temperature problem in the K-Pod of the BCJ where plaintiff was housed from December 3, 2008, to January 1, 2009, but defendant Flicker took a month to fix the problem. According to the complaint, temperatures in K-Pod ranged from 42 degrees to 98 degrees. Plaintiff alleges that he should not have been exposed to such extreme temperatures because he has AIDS. (Sec. Am. Compl. at 3.)

Finally, plaintiff alleges that defendant Dr. Baker was aware that plaintiff had a mental health history and was recently released from a mental hospital. Nonetheless, plaintiff alleges, defendant Baker failed to prescribe plaintiff the appropriate medication to keep him from having suicidal thoughts. According to the complaint, plaintiff attempted suicide twice while incarcerated at the BCJ and only thereafter did defendant Baker prescribe him medication. Plaintiff alleges that even then, defendant Baker prescribed him the wrong medication. (Sec. Am. Compl. at 4.)

**SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

---

[2] It appears that defendant Durrett is a nurse practitioner and in that capacity was involved in plaintiff's care at the BCJ.

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

return a verdict for the nonmoving party, see <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." <u>T.W. Elec. Serv.</u>, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See <u>Anderson</u>, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See <u>Matsushita</u>, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

**OTHER APPLICABLE LEGAL STANDARDS**

I. <u>Civil Rights Act Pursuant to 42 U.S.C. § 1983</u>

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the

4

      Constitution . . . shall be liable to the party injured in an action at
law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff. See Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976). "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

      Moreover, supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of respondeat superior and, therefore, when a named defendant holds a supervisorial position, the causal link between him and the claimed constitutional violation must be specifically alleged. See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978). Vague and conclusory allegations concerning the involvement of official personnel in civil rights violations are not sufficient. See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

II. Fourteenth Amendment and Adequate Medical and Mental Health Care

      Although pretrial detainees are lawfully in state custody, they are not prisoners subject to punishment by the state and are entitled to protection under the Fourteenth Amendment Due Process Clause. See Bell v. Wolfish, 441 U.S. 520, 537 n.16 (1979) (unlike sentenced inmates the state is not allowed to punish pretrial detainees and therefore the Due Process Clause applies). Cf. Jones v. Blanas, 393 F.3d 918, 933-35 (9th Cir. 2004) (the Fourteenth Amendment standard applies to conditions of confinement when civil detainees have not been convicted of a crime).

      Under the Fourteenth Amendment Due Process Clause, the state may not impose conditions of confinement on a pretrial detainee that inflict punishment. See Clouthier v. County

5

of Contra Costa, 591 F.3d 1232 (9th Cir. 2010). "The key question 'in determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word,' is whether the restrictions evince a punitive purpose or intent." Id. at 1242 (quoting Bell, 441 U.S. at 538-39).

With respect to a pretrial detainee's medical and mental health care claims, the Ninth Circuit Court of Appeals recently clarified that "the 'deliberate indifference' standard applies to claims that correction facility officials failed to address the medical needs of pretrial detainees." Clouthier, 591 F.3d at 1242. Specifically, the Ninth Circuit explained that:

> under Bell and our cases, we must consider whether [a plaintiff] was subjected to punishment. This requires us to inquire into the subjective component of punishment, that is, whether [the defendants] acted with deliberate indifference as defined in Farmer and our cases.

Clouthier, 591 F.3d at 1243. See also Simmons v. Navajo County, 609 F.3d 1011, 1017 (9th Cir. 2010) ("Although the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment's protection against cruel and unusual punishment, applies to pretrial detainees, we apply the same standards in both cases.") (internal citations omitted).

Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" Farmer, 511 U.S. at 835. Under the deliberate indifference standard, a person may be found liable for denying adequate medical care if he "knows of and disregards an excessive risk to inmate health and safety." Id. at 837. See also Estelle v. Gamble, 429 U.S. 97, 106 (1976); Lolli v. County of Orange, 351 F.3d 410, 418-19 (9th Cir. 2003); Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994). A deliberate indifference claim predicated upon the failure to provide medical treatment has two elements:

> First, the plaintiff must show a "serious medical need" by demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" Second, the plaintiff must show the defendant's response to the need was deliberately indifferent.

6

Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1991) (an Eighth Amendment medical claim has two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need."), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I. Defendant Durett and Baker's Statement of Undisputed Facts and Evidence

The defendants' statement of undisputed facts is supported by a declaration signed under penalty of perjury by Nurse Linda Wilms and copies of plaintiff's medical records from the Chico Family Health Clinic and from BCJ. It is also supported by a declaration signed under penalty of perjury by defense counsel Varanini and copies of plaintiff's medical records from High Desert State Prison ("HDSP"), New Folsom State Prison and Mule Creek State Prison. Finally, it is supported by a declaration signed under penalty of perjury by medical expert, Dr. John Levin.

The evidence submitted by defendants Durett and Baker establishes the following. On June 11, 2008, Dr. Cottrell saw plaintiff at the Chico Family Health Clinic and noted that he had a history with chronic back pain for which he had used medicinal marijuana. Dr. Cottrell also noted that plaintiff "has had work up off and on during jail time and they have told him everything seems pretty stable." Dr. Cottrell refilled plaintiff's prescription for Ibuprofen, a non-narcotic medication. Finally, Dr. Cottrell noted that plaintiff was depressed and anxious and prescribed him Lexapro for the depression and Klonopin for the anxiety. Dr. Cottrell indicated that he would be seen at the clinic in four weeks. (Defs.' SUDF 1-2 & 6, Wilms Decl. & Ex. A.)

On July 21, 2008, Dr. Cottrell saw plaintiff again. He noted that plaintiff had "some paralumbar tenderness to palpation with decreased range of motion [and] mild muscle spasms." Dr. Cottrell prescribed plaintiff one tablet of vicodin at night and noted that plaintiff could use Motrin as needed. He also prescribed plaintiff Wellbutrin and continued plaintiff on Klonopin for anxiety. (Defs.' SUDF 3 & 6, Wilms Decl. & Ex. A, Levin Decl.)

7

1        On September 6, 2008, plaintiff returned to the Chico Family Health Clinic for the last time and sought prescription refills for his medications aimed at treating depression, anxiety, and chronic back pain. Upon examination, Dr. Cottrell found "some mild paralumbar tenderness to palpation [and] decreased range of motion." Plaintiff's neurologic exam was without abnormality. Dr. Cottrell renewed his order of one vicodin at night for plaintiff. He also noted that plaintiff could use Ibuprofen as needed. (Defs.' SUDF 4-5, Wilms Decl. & Ex. A, Levin Decl.)

        Turning to plaintiff's incarcerations at BCJ, in June 2008, medical staff at BCJ initially saw plaintiff and placed him on suicide watch in a safety cell because plaintiff had commented during the booking process that he had suicidal thoughts. Mental health staff at BCJ evaluated plaintiff after he was seen by medical staff. On June 4, 2008, plaintiff reported to LCSW Johansen that he had taken "psych meds" but that he had done so "years ago." Plaintiff also reported a desire to go to the mental health unit instead of the jail. Finally, plaintiff admitted that he had no history of suicidal attempts or any psychiatric admissions. (Defs.' SUDF 7-10, Wilms Decl. & Ex. A.)

        On August 21, 2008, plaintiff presented with superficial cuts on his hands and wrists. He reported to medical staff at BCJ that he had been receiving treatment from Dr. Cottrell at the Chico Family Clinic and that he had been taking Wellbutrin, Klonopin, Vicodin, and Seroquel. In addition, plaintiff reported that he has back pain as a result of a 2003 car accident. Plaintiff was placed in the safety cell by medical staff as a precaution. BCJ medical staff confirmed with the Wal-Mart pharmacy that plaintiff had previously picked up prescriptions for Vicodin and Klonopin but had not picked up his prescriptions for Seroquel and Wellbutrin. Defendant Baker, BCJ's psychiatrist, issued an order for plaintiff to continue Klonopin. On the same day, however, plaintiff was released from custody. (Defs.' SUDF 11-14, Wilms Decl. & Ex. A.)

/////

1    Two days later, on August 23, 2008, plaintiff returned to BCJ and reported to
2 medical staff that he had been receiving treatment from Dr. Cottrell at the Chico Family Clinic.
3 He also reported that Dr. Cottrell had prescribed him Klonopin, Seroquel, and Wellbutrin.  On
4 August 24, 2008, plaintiff saw MFT Deborah Saeger, and she noted in plaintiff's file that he had
5 previously picked up Klonopin and Vicodin at a pharmacy but had not picked up his
6 prescriptions for Wellbutrin and Seroquel.  On August 25, 2008, MFT Saeger evaluated plaintiff
7 and reported that he had a "garbage bag of samples from BCBH [Butte County Behavioral
8 Health]," was depressed, and found it hard to sleep.  During his visit with MFT Saeger, plaintiff
9 acknowledged that he had been arrested for possession of a controlled substance,
10 methamphetamine.  MFT Saeger's impression of plaintiff included "Drug abuse, poor insight,
11 limited skills for coping with recovery. . . ."  (Defs.' SUDF 15-16, 18-19, Wilms Decl. & Ex. A.)

12   On December 3, 2008, plaintiff again returned to BCJ.  This time he reported that
13 he was taking Oxycodone, Methadone, Klonopin, and Soma, but he denied drug use.  He
14 presented with slurred speech, was drowsy, and was placed in the sobering cell.  BCJ medical
15 staff verified with the Costco and Rite Aid pharmacies that plaintiff had prescriptions for
16 Oxycodone, Methadone, Klonopin, and Soma.  (Defs.' SUDF 20-22, Wilms Decl. & Ex. A.)

17   Medical staff monitored plaintiff from December 4, 2008, to December 6, 2008,
18 for opiate withdrawal.  On December 11, 2008, defendant Baker renewed plaintiff's prescription
19 for Klonopin and prescribed Norco for him, a pain relief medication with much less addictive
20 potential than Vicodin.  On December 12, 2008, during a visit with LCSW Johansen, plaintiff
21 reported that he was attending Narcotics Anonymous meetings because the court required him to
22 do so.  Plaintiff also demanded his medications, namely, Methadone, Oxycodone, and Soma.  On
23 December 17, 2008, defendant Baker indicated in plaintiff's medical records that he intended to
24 taper plaintiff's Klonopin.   (Defs.' SUDF 23-26, Wilms Decl. & Ex. A., Levin Decl.)

25   On December 19, 2008, it was recorded in BCJ medical records that plaintiff used
26 cocaine on the weekends for ten years.  It was reported that plaintiff last used cocaine on

December 3, 2008. On December 22, 2008, MFT Johansen evaluated plaintiff. Again, plaintiff demanded his medication stating "I was promised lithium or some shit, you'd better check my chart." Plaintiff also reported that medical staff would be "hearing from his lawyer." During the evaluation, MFT Johansen urged plaintiff to try non-chemical coping methods. (Defs.' SUDF 27-29, Wilms Decl. & Ex. A.)

On December 25, 2008, plaintiff reported a slip and fall in the yard at BCJ and complained of an aggravation of his preexisting pain. Medical staff saw him and did not note any swelling, edema, or bruising. Plaintiff nonetheless received a three-day order for pain medication. On December 25, December 26, and December 27, 2008, plaintiff received Tylenol. On December 29, 2008, upon re-examination of plaintiff, defendant Durett noted no back spasms. In response to plaintiff's subjective reports of pain, defendant Durett continued plaintiff on his pain medication. (Defs.' SUDF 30-33, Wilms Decl. & Ex. A.)

On April 2, 2009, MFT Saeger conducted a further evaluation of plaintiff and reported that plaintiff had been convicted following his trial in state court on March 27, 2009, and was sentenced to seventeen years in state prison. Given the stress from that recent conviction, MFT Saeger scheduled plaintiff for a further psychiatric evaluation. On April 8, 2009, plaintiff was not available for the scheduled "telepsych" because he was in court. On April 15, 2009, defendant Baker prescribed plaintiff Trazadone, and on May 5, 2009, he saw plaintiff on "telepsych." Plaintiff reported at that time that he had lost at trial and was experiencing stress and depression caused by that loss. (Defs.' SUDF 34-36, Wilms Decl. & Ex. A.)

The first indication from any source that there was any issue or concern related to plaintiff's HIV condition was after plaintiff was transferred to HDSP and the staff there sent a note to BCJ medical staff asking about records concerning plaintiff's HIV condition. The response from BCJ was that there had been no indication by plaintiff during his incarceration there that he was suffering from HIV. (Defs.' SUDF 37, Wilms Decl. & Ex. A, Levin Decl.)

/////

1           Plaintiff had arrived at HDSP on May 14, 2009.  The intake history included the
2  notation that plaintiff was a polysubstance drug abuser.  He was prescribed Tylenol #3 for pain
3  but complained on May 18, 2009, and again on May 28, 2009, that it was ineffective.  Plaintiff
4  reported that doctors at the county jail had prescribed him Norco.  Plaintiff revealed to providers
5  at HDSP that he had HIV, and they ordered testing on May 28, 2009.  Plaintiff was subsequently
6  transferred to New Folsom State Prison and then to Mule Creek State Prison.  Upon being
7  transferred to New Folsom State Prison, plaintiff complained that he was suffering nerve pain
8  from HIV as well as chronic pain from a car accident and that he was not receiving any pain
9  medication.  (Defs.' SUDF 38-41, Varanini Decl. & Ex. A.)
10          On September 18, 2009, medical staff at Mule Creek State Prison prescribed
11 plaintiff Methadone for his reported nerve pain.  In January 2010, prison medical staff tapered
12 the methadone as a result of reports by prison staff that plaintiff was "hoarding" the drug.  The
13 prison physician informed plaintiff at that time that he could not be put back on a medication that
14 he had been "hoarding."  (Defs.' SUDF 42-45, Varanini Decl. & Ex. A.)
15          According to Dr. Levin, there is no reference of any kind in plaintiff's records
16 from the Chico Family Health Clinic that he had reported testing positive for HIV, suffered from
17 HIV, or was even concerned that he might have been exposed to HIV.  In addition, Dr. Levin
18 declares that the health care providers at BCJ prescribed plaintiff pain medication in compliance
19 with the applicable standard of care.  (Defs.' SUDF 46-47, Varanini Decl. & Ex. A, Levin Decl.)

20 II.  Defendants' Arguments

21          Defense counsel argues that under the undisputed facts of this case, the defendants
22 responded to plaintiff's medical complaints properly and effectively and acted within the
23 recognized standard of care.  In counsel's view, there is no admissible evidence before the court
24 which supports a claim of deliberate indifference against either defendant.  (Defs.' Mem. of P. &
25 A. at 9, 12-14.)
26 /////

III. Plaintiff's Opposition

In opposition to defendants' motion, plaintiff argues that there are many issues of disputed material fact in this case. For example, plaintiff argues that he submitted numerous request slips and grievances to alert defendant Durett of his Methadone withdrawal. Plaintiff contends that his doctor outside of BCJ, Dr. Neaushatz, had prescribed him Methadone for four consecutive months prior to his incarceration, and that he needed to taper off of the drug to avoid the withdrawal symptoms he experienced at the BCJ. Plaintiff notes that defense counsel subpoenaed his medical records from Dr. Neaushatz, which show that he had substantial pain issues and was taking more than the one Vicodin Dr. Cottrell prescribed him. In fact, plaintiff contends that he had stopped seeing Dr. Cottrell. Plaintiff also argues that he told defendant Durett in person that he had HIV and did not tell anyone else, including Dr. Cottrell or custody staff because it was not relevant to why he was seeing them and because it was none of their business. (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 1-2, 5, 7-8, 11-12 & Exs.)

Plaintiff also argues that roughly ten different doctors including three doctors prior to his incarceration had diagnosed him as suffering from various mental disorders. Specifically, plaintiff contends that prior to his arrest and incarceration at BCJ he was in a mental hospital and was diagnosed as suffering from schizophrenia, audio hallucinations, bipolar II, agoraphobia, paranoia, and severe depression. Plaintiff argues that despite this history, defendant Baker failed to treat him during his incarceration at BCJ. For example, plaintiff contends that defendant Baker did not care to look at his mental health records or recent hospitalizations. Plaintiff contends that defendant Baker only decided to take him off of his anxiety medication to see if he actually had a mental disorder and took this action without first seeing him in person. Plaintiff contends that he has been on "psych meds" since he was a child and tried to commit suicide at the age of nine. Finally, plaintiff notes that defendant Baker refused to provide him with his prescribed medication, Wellbutrin and Seroquel, simply because plaintiff had not picked them up from a pharmacy. However, plaintiff explains, the reason he had not picked the

medications up was that he could not afford to pay for those medications at the time and that his doctor had given him months of samples in the meantime. (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 3, 5-6, 8-10 & Exs.)

IV. Defendants' Reply

In reply, defense counsel argues that plaintiff's opposition contains no competent admissible evidence indicating that the defendants' conduct fell below the applicable standard of care. Rather, according to the defendants, plaintiff has only attempted to piece together portions of medical records from various physicians and added his own "medical" analysis of those records. (Defs.' Reply at 5-9.) Defendants contend that on this record, they are entitled to summary judgment in their favor.

**ANALYSIS**

I. Plaintiff's Serious Medical and Mental Health Care Needs

The undersigned concludes that based upon the evidence presented by the parties in connection with the pending motion a reasonable juror could conclude that plaintiff's chronic back pain, his withdrawal symptoms, his HIV-positive status, and his various mental health conditions constitute objective, serious medical and mental health needs. See McGuckin, 974 F.2d at 1059-60 ("The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment."); see also Doty, 37 F.3d at 546 (deliberate indifference standard also applies to cases involving a prisoner's mental health care); Canell v. Bradshaw, 840 F. Supp. 1382, 1393 (D. Or. 1993) (the Eighth Amendment duty to provide medical care applies "to medical conditions that may result in pain and suffering which serve no legitimate penological purpose."). Specifically, plaintiff's medical history demonstrates that a failure to treat him could result in "further significant injury" and the "unnecessary and wanton infliction of pain." See, e.g., McGuckin, 974 F.2d at 1059.

1 Accordingly, defendants' motion for summary judgment hinges on whether, based upon the
2 evidence before the court, a rationale jury could conclude that defendants Durett and Baker
3 responded to plaintiff's serious medical and mental health care needs with deliberate
4 indifference.

5 II. <u>Defendants' Response to Plaintiff's Serious Medical and Mental Health Care Needs</u>

6        Based on the evidence submitted in connection with the pending motion, the court
7 finds that defendants Durett and Baker have failed to carry their initial responsibility of
8 demonstrating that there is no genuine issue of material fact with respect to the adequacy of the
9 medical and mental health care they provided to plaintiff.

10        As to defendant Durett, defense counsel acknowledges plaintiff's allegations that
11 defendant Durett was aware that plaintiff suffered from chronic pain, that he failed to provide
12 plaintiff with adequate pain management or help him through his withdrawal from Methadone
13 and Oxycodone, and that he failed to treat his HIV. (Defs.' Mem. of P. & A. at 2.) Nonetheless,
14 defense counsel fails to offer adequate evidence regarding or address in any way in the pending
15 motion, how defendant Durett treated plaintiff's serious medical needs during plaintiff's
16 incarceration at BCJ. As an initial matter, defense counsel has not submitted a declaration by
17 defendant Durett or any other evidence explaining what the defendant Durett's medical
18 qualifications are or whether he was adequately trained to determine what plaintiff's medical
19 needs were with respect to his serious medical conditions. See <u>Ortiz v. City of Imperial</u>, 884
20 F.2d 1312, 1314 (9th Cir. 1989) ("access to medical staff is meaningless unless that staff is
21 competent and can render competent care").

22        Moreover, it is not clear from the evidence presented in connection with the
23 pending motion how defendant Durett treated plaintiff's chronic back pain, if at all. Defense
24 counsel has submitted evidence that on December 29, 2008, defendant Durett saw plaintiff for a
25 follow-up examination after his slip and fall accident and issued an order to continue his pain
26 medication as written and that in the days preceding his follow-up examination plaintiff had

received Tylenol.  However, plaintiff had been incarcerated at BCJ well before and long after his slip and fall accident.  Defense counsel does not adequately address these time periods even though it is undisputed that BCJ medical staff had confirmed that plaintiff recently had been given prescriptions for Oxycodone, Methadone, and Soma and had also received prescriptions for Ibuprofen and Vicodin for his chronic back pain. (Wilms Decl., Ex. A at 67, 83-85.)  In this regard, it is not clear whether defendant Durett had an opportunity to, or was legally required to, do more than he did on December 29, 2008 when he merely gave plaintiff additional Tylenol.  In addition, although defense counsel has submitted evidence to show that BCJ medical staff monitored plaintiff for withdrawal symptoms for three days, it is not at all clear from the evidence presented whether defendant Durett was involved in this decision, and if so, how or why he chose this course of treatment.  Nor is it clear from the evidence before the court if three days of monitoring is considered adequate medical care for Methadone and Oxycodone withdrawal.

       Finally, in response to plaintiff's HIV-related allegations, defense counsel contends that the first indication that plaintiff had HIV was when HDSP sent a note to BCJ staff asking about records concerning that condition.  The BCJ response was that there had been no indication by plaintiff that he was suffering from HIV.  However, this evidence does not directly address whether defendant Durett was aware plaintiff had HIV, as plaintiff claims he was.  Again, no declaration from defendant Durett has been submitted in connection with the motion.  In this regard, it is not clear what defendant Durett knew, if anything, with regard to plaintiff's HIV status and need for treatment.

       As to defendant Dr. Baker, defense counsel acknowledges plaintiff's allegations that defendant Baker failed to prescribe him with the necessary psychiatric medication. (Defs.' Mem. of P. & A. at 2-3.)  However, defense counsel again fails to offer adequate evidence or in any way address in the pending motion how defendant Dr. Baker treated plaintiff's serious mental health needs during plaintiff's incarceration at BCJ.  Again, as an initial matter, defense

counsel has not submitted a declaration by defendant Baker or any other evidence describing his medical qualifications or whether he was adequately trained to determine what plaintiff's treatment needs were with respect to his serious mental health conditions.  See Ortiz, 884 F.2d at 1314.

Moreover, defense counsel relies on SUDF 26 to demonstrate that defendant Dr. Baker treated plaintiff's mental health needs properly and effectively.  That statement provides:

> Dr. Baker evaluated the plaintiff on December 17, 2008 and noted that plaintiff had been treated at the Butte County Behavioral Health Center with a diagnosis of Bipolar II, anxiety.  Dr. Baker found there to be no "thought disorder," no suicidal ideation or homicidal ideation, and his plan was to "rule out" the possibility of Bipolar II disorder and personality disorder.  The plan to implement this diagnostic regime was to begin a tapered withdrawal plan for the Klonopin.

For evidentiary support for this statement, however, defense counsel cites a page of plaintiff's medical records containing only defendant Baker's notes to taper plaintiff's Klonopin.  (Wilms Decl., Ex. A at 8.)  There is no evidence before the court to support counsel's language quoted above nor any other indication that defendant Dr. Baker ever evaluated plaintiff prior to deciding to taper his Klonopin.  In this regard, it is not clear from the evidence before the court how or why defendant Baker reached any of his decisions with respect to the prescription of medications and mental health care provided to plaintiff at the BCJ.  Nor is it clear whether defendant Baker's decision to taper plaintiff's Klonopin constituted adequate mental health care particularly in light of the fact that it is undisputed that BCJ medical staff had confirmed that plaintiff recently had received prescriptions for Klonopin as well as for Wellbutrin and Seroquel in connection with the treatment of his mental health disorders.  (Wilms Decl., Ex. A at 83-85.)

Finally, the court acknowledges Dr. Levin's expert declaration in support of the pending motion.  According to the declaration, Dr. Levin is Board Certified in Emergency Medicine and is a member of the Emergency Medicine Committee at Arcadia Methodist Hospital.  Dr. Levin declares that he has provided care to patients with complaints of low-back

pain and patients with a history of Methadone and pain medication use. He also declares that he has reviewed plaintiff's medical records. Based on his review, Dr. Levin concludes that the defendants provided plaintiff with medical and mental health treatment within the applicable standard of care. However, Dr. Levin's declaration does not demonstrate the absence of a genuine issue of material fact either. Specifically, Dr. Levin's declaration merely parrots many of defendants' statement of undisputed facts, which this court has already determined fail to adequately address how the defendants in fact treated plaintiff's undisputedly serious medical and mental health conditions. Moreover, Dr. Levin has never examined plaintiff and was not present at BCJ during the time of the events in question. Nor does it appear that Dr. Levin has spoken with either of the defendants or any of plaintiff's other treating physicians about his medical and mental health needs.

Ultimately, this case may prove to present a mere difference of opinion between plaintiff and the defendants who provided medical treatment to him and thus may not give rise to a cognizable § 1983 claim. See, e.g., Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004); Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996). On the other hand, plaintiff may be able to establish that this is instead a case where the defendant medical care providers deliberately ignored the express orders of plaintiff's prior treating physicians. See, e.g., Jett, 439 F.3d at 1097-98 (prison doctor may have been deliberately indifferent to a prisoner's medical needs when he decided not to request an orthopedic consultation as the prisoner's emergency room doctor had previously ordered). Based on the evidence presented by defendants in connection with the pending motion for summary judgment, the court simply cannot determine to what extent defendants knew of and disregarded plaintiff's serious medical and mental health care needs. It is the defendants' "affirmative duty" as the moving parties under Rule 56 to demonstrate their "entitlement to judgment as a matter of law." Martinez v. Stanford, 323 F.3d 1178, 1182-83 (9th Cir. 2003). This, they have failed to do.

/////

Accordingly, for the reasons set forth above, the court concludes that the motion for summary judgment brought on behalf of defendants Durett and Baker should be denied.

## CONCLUSION

IT IS HEREBY ORDERED that the Clerk of the Court is directed to randomly assign a United States District Judge to this action.

IT IS HEREBY RECOMMENDED that defendants' January 31, 2011 motion for summary judgment (Doc. No. 49) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: May 31, 2011.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:9
dong0360.57Baker